UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

                                         Chapter 7

In re

ALLOU DISTRIBUTORS, INC., et al.,                Case No. 03-82321-ess

              Debtors

---------------------------------------------------------------x
KENNETH P. SILVERMAN, as Trustee of
ALLOU DISTRIBUTORS, INC., et al.,

              Plaintiff,

     -against-                           Adv. Pro. No. 05-8219-ess

SOUND AROUND, INC.,

              Defendant

---------------------------------------------------------------x

## MEMORANDUM DECISION AFTER TRIAL ON TRUSTEE'S CLAIMS FOR AVOIDANCE AND RECOVERY OF A FRAUDULENT TRANSFER

*Appearances*:

Ronald J. Friedman, Esq.
David J. Mahoney, Esq.
Silverman Acampora LLP
100 Jericho Quadrangle, Suite 300
Jericho, NY 11753
Attorneys for Plaintiff

Stuart A. Blander, Esq.
Evan R. Shusterman, Esq.
Heller, Horowitz & Feit, P.C.
292 Madison Avenue
New York, NY 10017
Attorneys for Defendant.

**HONORABLE ELIZABETH S. STONG**
**UNITED STATES BANKRUPTCY JUDGE**

This adversary proceeding (the "Adversary Proceeding") was commenced on March 16, 2005, by the filing of a complaint (the "Complaint") by Kenneth P. Silverman, as Chapter 7 Trustee of Allou Distributors, Inc. (the "Trustee" or "Plaintiff") against Sound Around, Inc. ("Defendant" or "Sound Around").  On August 26, 2005, the Trustee filed an Amended Complaint (the "Amended Complaint") in which he seeks to avoid and recover a transfer in the amount of $149,945, made by Allou Distributors, Inc. ("ADI") and related entities ("Allou" or the "Debtors") to Sound Around (the "Sound Around Transfer").  The Amended Complaint pleads claims for actual fraud pursuant to Section 276 of the New York Debtor and Creditor Law (the "DCL"), constructive fraud pursuant to DCL Sections 273, 274, and 275, and unjust enrichment.

The Trustee withdrew his claims for actual fraud and the remaining claims were tried to the Court.  Based on the entire record, including the testimony of witnesses, the exhibits, and the arguments of counsel, for the reasons set forth below, the Court concludes that the Trustee has not established that the Sound Around Transfer was a constructively fraudulent transfer.

## Jurisdiction

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(b).  This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(H).  The following are the Court's findings of fact and conclusions of law after trial pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## Background

*Factual Background*

<u>The Debtors' Bankruptcy Cases</u>  Prior to its bankruptcy filing, Allou was a distributor of health and beauty aid products, pharmaceuticals, fragrances, and cosmetics.  Amended Complaint ¶ 6.  On April 9, 2003 (the "Petition Date"), involuntary Chapter 11 petitions were filed against ADI and three of its affiliates, M. Sobol, Inc., Direct Fragrances, Inc., and Standford Personal Care, Inc. (the "Original Debtors").  Case No. 03-82321, Docket No. 1, Case No. 03-82323, Docket No. 1, Case No. 03-82324, Docket No. 1, Case No. 03-82325, Docket No. 1; Amended Complaint ¶ 7.  The Original Debtors consented to the entry of orders for relief under Chapter 11, and on April 10, 2003, the Court issued orders for relief in each of the Original Debtors' Chapter 11 cases.  Case No. 03-82321, Docket Nos. 3, 4.

On April 18, 2003, involuntary Chapter 11 petitions were filed against two ADI affiliates, Trans World Grocers Inc. ("Trans World") and Rona Beauty Supplies, Inc. ("Rona Beauty").  Case No. 03-82660, Docket No. 1, Case No. 03-82661, Docket No. 1.  On May 1, 2003, the Court entered orders for relief in the Chapter 11 cases of Trans World and Rona Beauty (the "Subsequent Debtors").  Case No. 03-82660, Docket No. 9, Case No. 03-82661, Docket No. 9.

On April 25, 2003, voluntary Chapter 11 petitions were filed on behalf of four ADI subsidiaries, Core Marketing, Inc., HBA Distributors, Inc., HBA National Sales Corp., and Pastel Cosmetic & Beauty Aids, Inc.  Case No. 03-82838, Docket No. 1, Case No. 03-82840, Docket No. 1, Case No. 03-82841, Docket No. 1, Case No. 03-82839, Docket No. 1.  On July 11, 2003, Allou Healthcare Inc. ("AHI"), a direct or indirect parent of the Debtors, consented to the entry of an order for relief under Chapter 11 and the joint administration of its case with those of the Original Debtors and Subsequent Debtors.  Amended Complaint ¶¶ 6, 12; Case No. 03-

82662, Docket No. 62.

By order dated September 16, 2003, the Debtors' Chapter 11 cases were converted to liquidation cases under Chapter 7 of the Bankruptcy Code.  Case No. 03-82321, Docket No. 583.  Kenneth P. Silverman was appointed as the Chapter 7 trustee in these cases.  *Id*.  The Debtors' cases were substantively consolidated by order dated December 22, 2003.  Case No. 03-82321, Docket No. 923.

Allou's Principals  Victor Jacobs and his sons Herman Jacobs and Jacob Jacobs (the "Jacobs") held approximately 61 percent of the voting stock of AHI.  Amended Complaint ¶ 16.  The Jacobs held various positions as officers of Allou and were controlling shareholders of Allou at all relevant times.  Amended Complaint ¶ 16.  On June 30, 2003, involuntary Chapter 7 bankruptcy petitions were filed against Victor Jacobs, Herman Jacobs, and Jacob Jacobs.  Amended Complaint ¶ 20.  Orders for relief were entered on September 9, 2003, and Allan B. Mendelsohn was appointed as the Chapter 7 trustee in these cases.  Amended Complaint ¶ 20.

The Jacobs' Fraudulent Scheme  The Jacobs, their wives, relatives, accomplices, and others participated in a "long-running and massive fraudulent scheme" where the Jacobs misrepresented Allou's financial condition by inflating inventory and accounts receivable records.  Amended Complaint ¶ 17.  The Jacobs grossly inflated Allou's accounts receivable by generating tens of millions of dollars of unsubstantiated invoices reflecting the sales of products to customers.  Amended Complaint ¶ 23.

The Jacobs reported these "bogus sales" to Allou's lenders as legitimate accounts receivable which increased the amount Allou was permitted to borrow under its loan agreement.  *Id*.  That is, Allou could borrow $8.5 million for every $10 million in unsubstantiated invoices it

created. *Id.* Because Allou could borrow only against receivables that were outstanding for less than 90 days, the unsubstantiated invoices were "paid" by checks issued by a series of companies affiliated with the Jacobs. *Id.*

The Jacobs caused Allou to engage in "bogus purchases of products from affiliated companies." Amended Complaint ¶ 24. This inflated the inventory Allou reported to its lenders, increased the amount Allou borrowed under its loan agreement, and concealed funds transferred to affiliated companies. *Id.* At times, these funds were transferred back to Allou by the affiliated companies in payment of the unsubstantiated invoices. *Id.*

*Procedural History*

The Trustee commenced this action by filing the Complaint on March 16, 2005. The Complaint seeks actual and punitive damages against Sound Around for actual fraud under DCL Section 276 and interest and attorneys' fees under DCL Section 276-a, constructive fraud under DCL Sections 273, 274, and 275, and unjust enrichment. Complaint ¶¶ 31-44. On April 18, 2005, Sound Around filed a Motion to Dismiss Complaint (the "Motion to Dismiss Complaint") on grounds that the Complaint did not satisfy the pleading requirements of Rules 9(b) and 8(a) of the Federal Rules of Civil Procedure. Defendant's Memorandum of Law in Support of Motion to Dismiss Complaint at 3-6.

On July 28, 2005, the Court, by former Bankruptcy Judge Melanie Cyganowski, dismissed with leave to replead the Trustee's claim for actual fraud under DCL Section 276 and request for punitive damages, and sustained the Trustee's claims for constructive fraud under DCL Sections 273, 274, and 275 and unjust enrichment. Docket No. 13 (the "July 28, 2005 Order") at 2. On August 26, 2005, the Trustee filed the Amended Complaint alleging the same

claims but no longer seeking punitive damages.  Amended Complaint ¶¶ 46-59.

On September 26, 2005, Sound Around filed an answer (the "Answer") to the Amended

Complaint denying liability and asserting the affirmative defense that Sound Around "acted in

good faith . . . and provided fair consideration" to Allou for any funds received.  Answer ¶¶ 1-8.

On January 3, 2008, the parties filed a Joint Pretrial Memorandum (the "Joint Pretrial

Mem.") and stipulated as follows:

1.  On or about June 15, 1999, the Debtors transferred $149,945.00 (the "Transfer") to Sound Around.

2.  The Transfer constituted a transfer of the Debtors' interest in property.

3.  The Debtors were insolvent at the time of the Transfer.

4.  At the time of the Transfer, the Debtors were engaged in a business or transaction for which the property remaining in its possession after the conveyance was unreasonably small capital.

5.  At the time of the Transfer, the Debtors had incurred debts beyond its ability to pay them as they matured.

6.  No portion of the Transfer was returned to the Debtors or anyone associated with the Debtors, including any member of the Jacobs family.

7.  Zigmund Brach had no personal or business ties to any member of the Jacobs family.

Joint Pretrial Mem. ¶¶ 1-7.  Based on these stipulated facts, the only issue remaining for trial is

whether the Sound Around Transfer was made without fair consideration.

The issue of fair consideration was tried to the Court on January 14 and February 6,

2008.  At the commencement of trial, the Trustee withdrew with prejudice his claim for actual

fraud under DCL Section 276 and his request for interest and attorneys' fees under DCL Section

276-a.  Docket Entry dated January 14, 2008; Docket No. 42 (January 14, 2008, Trial Transcript

("January 14 Tr.")) at 6:1-14.  At the close of the Trustee's case, Sound Around made an oral

motion for judgment dismissing the Adversary Proceeding on grounds that the Trustee lacks

standing under Bankruptcy Code Section 544.  Docket Entry dated January 14, 2008; Docket No.

42 (January 14 Tr. at 152:10-24, 153:1-9).

On February 6, 2008, when trial resumed, the Trustee reopened his case in chief, with the

consent of Sound Around, to introduce evidence on his standing to bring these claims.  Docket

No. 29 (February 6, 2008, Trial Tr. ("February 6 Tr.") at 5:8-24, 8:11-12.)  *See* Docket No. 27

(January 31, 2008, letter from Sound Around to the Court).  On February 29, 2008, Sound

Around filed an Amended Motion for Judgment Dismissing Action arguing that the Trustee did

not establish that he has standing to bring this action.  Docket No. 30.  On March 17, 2008, the

Trustee filed a Memorandum of Law in Opposition to the Amended Motion for Judgment

Dismissing Action.  Docket No. 32.  After a hearing held on April 14, 2008, this Court issued a

Memorandum Decision and Order denying the Amended Motion for Judgment Dismissing

Action and finding that the Trustee had established his standing to bring this action.  *Silverman*

*v. Sound Around, Inc. (In re Allou Distributors, Inc.)*, 392 B.R. 24 (Bankr. E.D.N.Y. 2008).

The parties filed post-trial submissions on March 28, 2008, and March 31, 2008.  Docket

No. 34 (Defendant's Proposed Findings of Fact and Conclusions of Law); Docket No. 37

(Trustee's Proposed Findings of Fact and Conclusions of Law).  On May 16, 2008, the Court

referred the matter to mediation.  Docket No. 40 (Mediation Referral Order).  The mediation did

not lead to a settlement, and on April 1, 2009, the matter was submitted for decision.  Docket

Entry dated April 1, 2009.

## Discussion

Bankruptcy Code Section 544(b) authorizes the Trustee to avoid "any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim . . . ." 11 U.S.C. § 544(b)(1).  The "applicable law" upon which the Trustee relies is set forth in DCL Sections 273, 274, and 275.

DCL Sections 273,[1] 274,[2] and 275[3] provide that a transfer by a debtor is deemed constructively fraudulent if it is made without "fair consideration," and one of the following conditions is met:

(i) the transferor is insolvent or will be rendered insolvent by the transfer in question, DCL § 273; (ii) the transferor is engaged in or is about to engage in a

---

[1] DCL Section 273 provides:

Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

N.Y. DEBT. & CRED. LAW § 273.

[2] DCL Section 274 provides:

Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.

N.Y. DEBT. & CRED. LAW § 274.

[3] DCL Section 275 provides:

Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

N.Y. DEBT. & CRED. LAW § 275.

business transaction for which its remaining property constitutes unreasonably small capital, DCL § 274; or (iii) the transferor believes that it will incur debt beyond its ability to pay, DCL § 275.

*Sharp Int'l Corp. v. State St. Bank and Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 53 (2d Cir. 2006).

As noted above, the Trustee and Sound Around stipulated to all but one of the elements of the Trustee's constructive fraud claims. They stipulate that on June 15, 1999, Allou transferred $149,945 to Sound Around, that this was a transfer of Allou's interest in property, that at the time of the transfer, Allou was insolvent; that at the time of the transfer, Allou was engaged in a business or transaction for which the property remaining in its possession after the conveyance was unreasonably small capital, and that at the time of the transfer, Allou had incurred debts beyond its ability to pay as they matured. Joint Pretrial Mem. ¶¶ 1-5. For these reasons, the only issue to be decided by the Court is whether the Sound Around Transfer was made without fair consideration.

Under New York law, fair consideration is given for property:

(a)     When in exchange for such property, . . . as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

(b)     When such property, . . . is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, . . . .

N.Y. DEBT. & CRED. LAW § 272.

"'[F]air consideration has two components – the exchange of fair value and good faith – and both are required.'" *SEC v. Universal Express, Inc.*, 2008 WL 1944803, at *5 (S.D.N.Y. 2008) (quoting *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 376-77 (S.D.N.Y. 2003)). *See also Cohen v. Sutherland,* 257 F.2d 737, 742 (2d Cir. 1958) ("Fair consideration requires both a fair

equivalent and good faith."); *Southern Indus., Inc. v. Jeremias,* 66 A.D.2d 178, 182, 411

N.Y.S.2d 945, 948-49 (2d Dep't 1978) (lack of good faith renders transfer a fraudulent

conveyance even if fair value is received).

And the good faith at issue is that of the transferee.  *In re Sharp Int'l Corp.*, 403 F.3d at

54 n.4 ("'Good faith' in a constructive fraudulent conveyance claim 'is the good faith of the

transferee.'") (quoting *HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1059 n.5 (2d Cir. 1995)).  *See*

*Breeden v. Sprague Nat'l Bank (In re Bennett Funding Group, Inc.)*, 2000 WL 33711450, at *5

(B.A.P. 2d Cir. 2000) ("for constructively fraudulent transfer causes of action under [the DCL],

it is only the good faith of the transferee that is to be considered.").[4]

In assessing a party's good faith, courts have found:

> "[A] person seeking to set aside a conveyance upon the basis of lack of good faith
> must prove that one or more of the following factors is lacking: (1) an honest
> belief in the propriety of the activities in question; (2) no intent to take
> unconscionable advantage of others; and (3) no intent to, or knowledge of the fact
> that the activities in question will hinder, delay, or defraud others. . . ."  In short,
> "the lack of good faith imports a failure to deal honestly, fairly and openly."

*Ostashko v. Ostashko*, 2002 WL 32068357 at *22-23 (E.D.N.Y. 2002) (quoting *Southern Indus.,*

*Inc. v. Jeremias,* 66 A.D.2d 178, 183, 411 N.Y.S.2d 945, 948-49 (2d Dep't 1978).  *See also HBE*

*Leasing Corp. v. Frank*, 48 F.3d 623, 636 (2d Cir. 1995) ("where . . . a transferee has given

equivalent value in exchange for the debtor's property, the statutory requirement of 'good faith'

is satisfied if the transferee acted without either actual or constructive knowledge of any

---

[4]  *See also Sharp Int'l Corp. v. State St. Bank and Trust Co. (In re Sharp Int'l Corp.)*, 302
B.R. 760, 779 (E.D.N.Y. 2003), *aff'd*, 403 F.3d 43 (2d Cir. 2005) ("[S]tate and federal courts in
New York have differed as to whose good faith matters, with some suggesting that both parties'
good faith must be established, and others contending that the good faith requirement applies to
the transferee alone." (citations omitted)).

fraudulent scheme."); *In re Fill*, 82 B.R. 200, 219 (Bankr. S.D.N.Y. 1987) (good faith may be absent where a transferee knows of the transferor's poor financial condition when the transfer takes place).

Accordingly, to succeed on his claim to recover the Sound Around Transfer as a constructively fraudulent transfer, the Trustee bears the burden of establishing, by a preponderance of the evidence, that Allou did not receive fair consideration in exchange for the Sound Around Transfer.  That is, he must show either that there was not an exchange of fair value or that Sound Around did not act in good faith.  *See SEC v. Universal Express, Inc.*, 2008 WL 1944803 at *5 (quoting *Lippe*, 249 F. Supp. 2d at 376-77); *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Tech. Ltd.)*, 337 B.R. 791, 806 (Bankr. S.D.N.Y. 2005) ("under New York law 'good faith' is an integral part of the 'fair consideration' factor, and the plaintiff bears the burden of proving lack of fair consideration and by inference lack of good faith."); *American Inv. Bank v. Marine Midland Bank*, 191 A.D.2d 690, 692, 595 N.Y.S.2d 537, 538 (2d Dep't 1993) ("The burden of proving . . . the lack of fair consideration is upon the party challenging the conveyance.")

<u>The Trustee's Evidence</u>

The Trustee offered the testimony of Timothy Puopolo, a turnaround and workout consultant retained to "examine the debtors' books and records and assemble an analysis of all the disbursements that [Allou] made from the period beginning approximately January of 1997 through their bankruptcy filing."  January 14 Tr. at 21:16-23.  Mr. Puopolo was assisted by Donna Mangle, an Allou employee in the accounts payable department, who assembled paper documentation from Allou's accounts payable folders and additional information from Allou's

mainframe computer system for selected disbursements.  January 14 Tr. at 22:1-7, 22:14-22.

    <u>Review of Allou's Disbursements</u>  Mr. Puopolo selected disbursements to examine based on certain characteristics including "large disbursements," "disbursements that were made using handwritten checks," and frequent disbursements to the same payee.  January 14 Tr. at 25:12-24. Mr. Puopolo reviewed "approximately 4,500 individual payments that totaled up to 725 million" in disbursements, which represented a portion, but not all, of Allou's total disbursements. January 14 Tr. at 25:3-9.  Mr. Puopolo acknowledged that the $725 million in transactions that he reviewed represented less than half of Allou's transactions during that period.  January 14 Tr. at 110:13-18, 112:14-18.

    In examining a disbursement to determine whether it corresponded to a legitimate and verifiable transaction, Mr. Puopolo looked for back-up documentation, including an invoice marked with a stamp showing the date that the merchandise was received, the date that the invoice was received, and the date that the invoice was paid.  January 14 Tr. at 23:14-22.  He also looked for a "delivery receipt or bill of lading, depending on the mode of transport or shipment" and "green bar reports"[5] generated by Allou's mainframe computer system.  January 14 Tr. at 23:23-25; 24:1-3.

    Mr. Puopolo also examined data stored on Allou's mainframe computer system to determine how Allou recorded a payment and which purchase or vendor was associated with a particular payment.  January 14 Tr. at 64:18-23.  And he reviewed a vendor master list on the mainframe computer system that assigned a numerical identifier to each vendor and contained

---

    [5] "Green bar reports" were used by Allou's accounts payable department to verify quantities and prices of the merchandise, and by Allou's shipping and receiving department to verify the physical counts of inventory received.  January 14 Tr. at 24:4-13.

"the name of the company, [and] particular contact information in terms of street address, shipping addresses, contact phone numbers." January 14 Tr. at 31:17-25.

The Trustee offered into evidence ten accounts payable packets containing the types of back-up documentation identified by Mr. Puopolo as indicative of a legitimate and verifiable transaction.[6] Mr. Puopolo testified that "virtually every" verified transaction contained proof of receipt of goods. January 14 Tr. at 61:9-17. Seven of the ten accounts payable packets contain bills of lading. *See* Plaintiff's Exhs. 2, 3, 4, 6, 9, 10, and 11. The other three contain receiving reports or a UPS receipt, indicating that goods were received. *See* Plaintiff's Exhs. 5, 7, 8.

<u>Review of the Sound Around Transfer</u>  Mr. Puopolo learned of the Sound Around Transfer when he reviewed a handwritten check payable to Sound Around and selected it for further investigation. January 14 Tr. at 65:2-6; Plaintiff's Exh. 1 (June 15, 1999, check to Sound Around for $149,945). Mr. Puopolo assembled original documents and information from Allou's mainframe computer system related to the Sound Around Transfer. January 14 Tr. at 65:18-21.

---

[6] *See* Plaintiff's Exh. 2 (accounts payable packet for June 5, 1998, payment to Diversified Trading, Inc. in the amount of $2,028.72), Plaintiff's Exh. 3 (accounts payable packet for August 25, 1998, payment to Consumer Corp. in the amount of $81,900, Plaintiff's Exh. 4 (accounts payable packet for November 20, 1998, payment to Royal Supply Co. in the amount of $8,364.40, Plaintiff's Exh. 5 (accounts payable packet for August 2, 1999, payment to Diversified Trading Inc. in the amount of $36,549), Plaintiff's Exh. 6 (accounts payable packet for November 24, 1999, payment to Royal Supply Co. in the amount of $2,588.16), Plaintiff's Exh. 7 (accounts payable packet for April 18, 2002, payment to Con-Agra Grocery Products Co. in the amount of $26,631.37), Plaintiff's Exh. 8 (accounts payable packet for August 8, 2002, payment to Quality King Distributors, Inc. in the amount of $1,459.20), Plaintiff's Exh. 9 (accounts payable packet for October 4, 2002, payment to East Coast Cosmetics, Co. in the amount of $41,980.50), Plaintiff's Exh. 10 (accounts payable packet for October 29, 2002, payment to Procter & Gamble Distributing Co. in the amount of $243,617.92), Plaintiff's Exh. 11 (accounts payable packet for December 20, 2002, payment to Diamond Wholesale in the amount of $85,433.94).

Sound Around issued invoice no. 807287 to "Rona Dist." dated June 14, 1999 (the "Sound Around Invoice") describing the merchandise sold as "4,000 portable 3-band radio . . . 12,000 pocket AM/FM radio, 2,400 sport pocket AM/FM radio, 2,400 Trim Line telephone, 1,800 AM/FM alarm clock radio, 340 DLX 3 in 1 Clk/ Rd/Ca, [and] 1,800 portable radio dual cassette" (the "Merchandise").  Plaintiff's Exh. 1 (Sound Around Invoice).  Rona Beauty transferred $149,945, by check dated June 15, 1999, to Sound Around in payment of the Sound Around Invoice.  Plaintiff's Exh. 1 (June 15, 1999, check to Sound Around for $149,945).

Mr. Puopolo did not find a vendor number or any other reference to Sound Around on Allou's mainframe computer system.  January 14 Tr. at 88:25-89:1-5.  Rather, Allou's mainframe computer system showed that the Sound Around Transfer was associated with vendor number 3056, the vendor number assigned to Arrow Distributing Corporation ("Arrow Distributing"), a company owned and controlled by the Jacobs.  January 14 Tr. at 88:16-21.  Mr. Puopolo looked for back-up documentation for the Sound Around Transfer in Allou's hard copy accounts payable records, and located the Sound Around Invoice in the accounts payable records for Arrow Distributing.  January 14 Tr. at 89:10-24, 90:1-4.

Allou's Two Sets of Books  Allou maintained two sets of accounting books and records on its mainframe computer system.  January 14 Tr. at 95:18-22.  As to the first set of books, "[t]he regular employees who had their regular access to the system were able to view actual product purchases and actual cash receipts and actual sales in furtherance of the verifiable portion of their business."  January 14 Tr. at 95:20-25-96:1.  As to the second set of books, these were referred to as the "root level" or "root level access" records.  January 14 Tr. at 96:2-14.  As Mr. Puopolo testified, "[Allou] maintained [this] set of books that they would provide to their

-13-

lender that showed inflated inventory and receivable amounts. They used this tool to perpetuate the fraud that was engaged [in] at Allou." January 14 Tr. at 95:19-22.

Transactions recorded on the root level access records could be accessed only by the Jacobs and Irvin Brown, the head of Allou's information technology department. January 14 Tr. at 95:11-16. They were not accessible or viewable by other Allou employees. January 14 Tr. at 97:3-8. Mr. Puopolo reviewed some 4,000 transactions that were recorded only on the root level access accounting for more than $700 million in payments. January 14 Tr. at 96:22-97:2. He was not able to verify that Allou received merchandise in exchange for any of the payments recorded only at the root level of Allou's records. January 14 Tr. at 98:24-99:3.

The Arrow Distributing Purchase Order  Mr. Puopolo also reviewed Allou's mainframe computer system to determine whether the Sound Around Transfer was associated with a purchase order. January 14 Tr. at 92:8-12. He found that the payment was associated with a much larger Arrow Distributing purchase order for fragrances, in the amount of $1,942,950. January 14 Tr. at 92:14-20; Plaintiff's Exh. 1 (Arrow Distributing purchase order). The Arrow Distributing purchase order was recorded on the root level access as the aggregate of a credit adjustment of $1.5 million on the mainframe computer system, the Sound Around Transfer, and other payments to third parties. January 14 Tr. at 93:8-15. Mr. Puopolo did not find back-up documentation for the $1.5 million credit adjustment. January 14 Tr. at 93:21-24.

Mr. Puopolo identified a bill of lading associated with the Arrow Distributing purchase order showing the same fragrance products and quantities that were listed on the Arrow Distributing purchase order. January 14 Tr. at 101:14-15; Plaintiff's Exh. 1 (August 19, 1999, Bill of Lading). The bill of lading was unsigned. January 14 Tr. at 102:17-19. He did not find

-14-

other proof that Allou received the products listed on the Arrow Distributing purchase order, such as, for example, a receiving report.  January 14 Tr. at 101:4-6, 102:20-22.

       <u>Distinctive Aspects of the Sound Around Invoice</u>  Mr. Puopolo found that certain aspects of the Sound Around Invoice were not consistent with Allou's verifiable transactions.  January 14 Tr. at 90:10-21.  These include handwritten notations stating "File in Arrow," "3056" (Arrow Distributors's vendor number), the initials "VJ" (for Victor Jacobs, Allou's chairman), and "ATTN: Mr. Jacobowitz.'"  January 14 Tr. at 90:12-22-91:2.  The Sound Around Invoice was also marked with an accounts payable stamp that was not filled out completely.  January 14 Tr. at 90:19-21.

       Mr. Puopolo did not locate bills of lading or receiving reports showing delivery and receipt of the items listed on the Sound Around Invoice.  January 14 Tr. at 103:16-23.  Nor did he find an accounts payable report "that would allow someone in accounts payable to compare the prices and the number of units identified in the Sound Around Invoice" on Allou's mainframe computer system.  January 14 Tr. at 103:24-104:3.

       <u>Rona Beauty's Business</u>  Rona Beauty, the entity that issued the $149,945 check to Sound Around, was a division of Allou that distributed "primarily" fragrances.  January 14 Tr. at 91:6-15.  In his review of Allou's books and records, Mr. Puopolo did not locate "any paper reflecting that Rona or the debtors were in the business of buying and selling three-band radios . . . pocket AM/FM radios . . . or sport-pocket AM/FM radios[.]"  January 14 Tr. at 91:14-25.

       In summary, Mr. Puopolo testified that he did not locate "a single piece of paper, a single screen image, [or] any indication that Sound Around provided any merchandise to Allou in exchange [for] the payment of $149,945."  January 14 Tr. at 104:12-16.

*Sound Around's Response to the Trustee's Evidence*

Sound Around argues that the Trustee has not produced any direct evidence that it did not provide the Merchandise to Allou in exchange for the Sound Around Transfer, that is, the Trustee has not offered any testimony from an Allou employee that the Merchandise was not received.  Defendant's Proposed Findings of Fact and Conclusions of Law ¶ 26(a).

Sound Around also argues that Mr. Puopolo's "analysis is deficient – and does not afford a sufficient basis for concluding that the [Merchandise was] not delivered" by Sound Around to Allou.  Defendant's Proposed Findings of Fact and Conclusions of Law ¶ 26.  Sound Around notes that "the vast majority of the transactions effected by Allou during the relevant period (both in number and dollar value) were not reviewed or considered by Mr. Puopolo." Defendant's Proposed Findings of Fact and Conclusions of Law ¶ 26(b).  And Sound Around argues that Mr. Puopolo "can provide no information or opinion as to whether, among the thousands of transactions which were not examined, there are legitimate purchases of goods by Allou which are nevertheless not 'fully documented' with, e.g., bills of lading, delivery tickets, etc."  *Id.*

In addition, Sound Around argues that the Trustee's definition of an "'unverifiable transaction,'" that is, a transaction with insufficient documentation, is "circular and essentially meaningless" because it means only "that the 'expected' documentation for a transaction no longer exists in the files of Allou [and] not that the transaction was 'fraudulent' or 'fictitious.'" Defendant's Proposed Findings of Fact and Conclusions of Law ¶ 26(h).

And Sound Around points to the fact that Mr. Puopolo did not contact any third-party shippers utilized by Allou to determine whether those shippers had records reflecting the

-16-

delivery of the Merchandise, but rather relied entirely on his examination of Allou's books and records.  Defendant's Proposed Findings of Fact and Conclusions of Law ¶ 26(k).

*          *          *

The Court finds that Mr. Puopolo was credible and persuasive as a fact witness testifying about his review of Allou's books of records including paper records and records maintained on Allou's mainframe computer system.  The Trustee's evidence shows that Allou's books and records do not contain the expected indications that Allou received the Merchandise as fair value for the Sound Around Transfer.  It also shows that Allou's books and records do not contain the expected indications that Allou had a business relationship with Sound Around.  And the Trustee's evidence shows that Allou did not record the Sound Around Transfer in its books and records in the way that many verifiable transactions were recorded.  Rather, the evidence shows that Allou recorded the Sound Around Transfer in its root level access records, which is consistent with the way that many fraudulent transactions were recorded.  In addition, the Trustee's evidence shows that the Sound Around Invoice had several distinctive characteristics that were not consistent with invoices used in several examples of Allou's verifiable transactions.

Here, even in the absence of direct evidence of lack of fair value in exchange for the Sound Around Transfer, the Trustee's showing that Allou's books and records do not specifically indicate receipt of the Merchandise is sufficient to make out a *prima facie* case and shift the burden of coming forward to Sound Around.  *See Pereira v. Bali Jewelry, Ltd. (In re Harvard Knitwear, Inc.)*, 193 B.R. 389, 397 n.18 (Bankr. E.D.N.Y. 1996) ("Fed. R. Evid. 803(7) provides that under certain circumstances, evidence that a matter is not entered into business

records may be admissible to prove the non-existence of that matter."). *See also Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*, 68 B.R. 530, 533 (Bankr. S.D. Fla. 1986) ("Plaintiff's proof that there is no record or indication of any consideration to the debtor shifts to defendant the burden of going forward with the evidence, though the ultimate burden of proof remains with the plaintiff."), *aff'd*, 848 F.2d 1196 (11th Cir. 1988); Barry Russell, BANKRUPTCY EVIDENCE MANUAL § 803.20 at 1554-56 (2008-09).[7]

*Sound Around's Evidence*

Sound Around offered the testimony of Mr. Brach, the owner of Sound Around, and Israel Newman, Sound Around's shipping clerk manager.

The Testimony of Mr. Brach  Mr. Brach is the sole shareholder and principal of Sound Around.  February 6 Tr. at 37:5-8.  Sound Around has been in the business of selling audio equipment for automobiles since 1977, and has approximately 100 employees.  February 6 Tr. at 37:3-14.  In the two years from November 1, 1998, to October 31, 2000, Sound Around had gross sales of more than $126 million.  February 6 Tr. at 39:1-11; Defendant's Exh. 3 (U.S. Corporation Income Tax Returns for Sound Around for 1998, 1999, and 2000).  Through 2006, Sound Around maintained a warehouse facility at 1600 63rd Street in Brooklyn, New York, and Mr. Newman was responsible for the warehouse operations.  February 6 Tr. at 40:3-15.

In 1994, Mr. Brach and Sound Around entered into a joint venture agreement with Sol

---

[7]  As noted above, the Trustee may establish the absence of fair consideration by establishing either a lack of the exchange of fair value or a lack of good faith.  *See* pp. 8-10, *supra*.  The Trustee does not directly argue that Sound Around did not act in good faith.  Nor does the Trustee's evidence suggest that Sound Around did not act in good faith, or a motive for Allou to have made the Sound Around Transfer.  *See* Joint Pretrial Mem. ¶¶ 6, 7.

Meyer and Dan Reich to sell and distribute electronic products including clock radios, telephones, radio cassette players, and similar items under the brand "Cougar" (the "Cougar Joint Venture").  February 6 Tr. at 40:19-24; Defendant's Exh. 4 (Arbitration Award).

In 1997, a dispute arose among the joint venture participants concerning the operation of the Cougar Joint Venture.  February 6 Tr. at 42:9-25, 43:1-5.  The dispute was submitted to a rabbinical arbitration panel for decision.  February 6 Tr. at 43:6-11.  By arbitration award dated September 9, 1998 (the "Arbitration Award"), the panel determined, among other things, that the Cougar Joint Venture was immediately to cease its operations.  Defendant's Exh. 4 (Arbitration Award).  To wind up the business, Mr. Brach was directed to "reduce [the Cougar Joint Venture] inventory on hand within six months to no more than $400,000," and "[w]hen the inventory is reduced to $400,000 or less, [Messrs.] Meyer and Reich agree to purchase the remaining inventory."  Defendant's Exh. 4 (Arbitration Award).  *See* February 6 Tr. at 45:11-25, 46:1-2.

Pursuant to the Arbitration Award, Sound Around advertised by "special bulletins" to sell as a "close out" all of its remaining Cougar merchandise.  February 6 Tr. at 51:16-25.  The target audience for these special bulletins was entities that wanted to buy a close-out product in general, rather than entities that wanted to buy a particular type of audio product.  February 6 Tr. at 64:4-10.  Sound Around eventually sold its entire inventory of Cougar merchandise.  February 6 Tr. at 51:16-22.

The Sound Around Invoice lists seven categories of items:  portable three-band radios, pocket radios, clock radios, three-in-one clock radios, telephones, alarm clocks, and cassette players.  Plaintiff's Exh. 1 (Sound Around Invoice).  The 1998 Cougar Catalog features six of the seven categories of items listed on the Sound Around Invoice.  February 6 Tr. at 44:23-45:7;

-19-

Defendant's Exh. 5 (1998 Cougar Catalog).  The remaining item was not listed in the 1998

Cougar Catalog because it was an older model listed in a catalog for an earlier year.  February 6

Tr. at 45:2-10.

Mr. Brach identified all of the Merchandise as Cougar items and part of the inventory

that he was directed to liquidate pursuant to the Arbitration Award.  February 6 Tr. at 46:3-9,

Plaintiff's Exh. 1 (Sound Around Invoice).  He noted that the prices listed on the Sound Around

Invoice were between 30 and 40 percent lower than the fair market value of the goods, and that

he set the prices for the items.  February 6 Tr. at 48:8-13, 58:14-22.

Mr. Brach did not speak with anyone from Rona Distributors about its order for or

purchase of the Merchandise.  February 6 Tr. at 65:8-10.  He did not recall the sale of the

Merchandise as shown on the Sound Around Invoice.  February 6 Tr. at 51:9-11.  He had no

personal knowledge as to who originated the sale, how the Merchandise left Sound Around's

warehouse, or whether the Merchandise was shipped by a Sound Around truck, shipped by a

third-party trucker, or picked up by the customer.  February 6 Tr. at 65:11-66:13.

Mr. Brach explained Sound Around's procedures for shipping goods.  First, a picking

ticket or order sheet was generated by Sound Around's office and sent down to the warehouse.

February 6 Tr. at 48:17-20.  Next, the warehouse manager decided how to ship the goods.

February 6 Tr. at 48:22-23.  When goods were not shipped on Sound Around's truck, a trucking

company was used.  February 6 Tr. at 49:2-6.

After the goods were shipped, a copy of the picking ticket or order sheet was returned to

the office and retained by Sound Around for "a year, 15 months."  February 6 Tr. at 49:16-23.

Picking tickets or order sheets could be retained longer where an invoice was not paid and

litigation had to be commenced.  February 6 Tr. at 49:24-50:2.  Disputes concerning deliveries arose "within [a] maximum [of] 60 days" when Sound Around's accounts receivable department asked for payment, prompting the customer to inform Sound Around that the goods were not delivered.  February 6 Tr. at 50:10-16.  If someone claimed four or five years later that the goods were not delivered, then Sound Around would not have documents that indicated delivery, because either the invoice would have been paid or Sound Around would have commenced a lawsuit.  February 6 Tr. at 50:22-51:4.  Sound Around retained invoices for "[a]bout three to four years" and there was no reason to retain them longer, because all of the information was stored on Sound Around's computer.  February 6 Tr. at 52:8-17.

Sound Around offered into evidence as a business record Sound Around's invoice sales journal for the period January 1, 1999, through December 31, 1999 (the "1999 Invoice Sales Journal").  Defendant's Exh. 1 (1999 Invoice Sales Journal).  When an invoice was generated, the information contained in the invoice was inputted into Sound Around's computer to create an entry in the invoice sales journal.  February 6 Tr. at 55:8-9.  The transaction shown on the Sound Around Invoice was reflected in the 1999 Invoice Sales Journal as:  "Invoice Date-6/14/99, Customer Number-ZR421, Customer Name-Rona Dist., Invoice Number-562014, Reference Number-807287, Sales Amount-$149,945, Freight Amount-$43.68, Miscellaneous Amount-0, Total Amount-$149,988.68."  Defendant's Exh. 1 (1999 Invoice Sales Journal).  *See* February 6 Tr. at 55:20-56:9.  Mr. Brach noted that the $43.68 freight entry was inputted into the computer in error because there would not have been a freight charge on a sale of that size involving thousands of items.  February 6 Tr. at 56:10-20; 72:9-10; 80:13-19.

Mr. Brach testified that before this Adversary Proceeding was commenced, he had never

heard of Rona Distributors.  February 6 Tr. at 86:17-20.  He had heard of "Mr. Jacobowitz" and

the Jacobs family generally, who were known in the Orthodox Jewish community.  February 6

Tr. at 86:19-23.  And the parties stipulate that Mr. Brach had "no 'personal' or 'business' ties to

any member of the Jacobs family," and that no portion of the funds comprising the Sound

Around Transfer was returned by Mr. Brach or Sound Around to the Jacobs family.  Joint

Pretrial Mem. ¶¶ 6, 7.  Mr. Brach stated that he had no reason to believe that the Merchandise

was not delivered, and that he did not assist any member of the Jacobs family in any kind of

fraud.  February 6 Tr. at 57:10-17.

    The Testimony of Mr. Newman  Mr. Newman has been the shipping clerk manager for

Sound Around for approximately twenty-five years.[8]  February 6 Tr. at 12:5-8.  His duties

include reviewing every "picking ticket" or order sheet, a document that describes the model

numbers and quantities of the merchandise sold, pulling the merchandise from inventory, and

deciding how it will be shipped.  February 6 Tr. at 12:9-13:5.  Mr. Newman explained that

smaller shipments were delivered by Sound Around's own trucks, some shipments were picked

up by customers using their own trucks, and some shipments were delivered by third-party

trucking companies.  February 6 Tr. at 13:6-16.  He processed at least forty or fifty trucking

orders each month.[9]  February 6 Tr. at 17:7-8.

    Mr. Newman explained that the types of documentation that would accompany a

shipment were a picking ticket or order sheet generated by Sound Around's office staff and a bill

---

[8]  Mr. Newman stopped working as a full-time shipping clerk manager for Sound Around
in 2006, and currently "fills-in" for managers who are away.  February 6 Tr. at 18:5-15.

[9]  Mr. Newman handled only the trucking orders, and orders shipped via UPS were
handled by Sound Around's "UPS Department."  February 6 Tr. at 24:19-25.

of lading that he created.  February 6 Tr. at 13:17-23.  Bills of lading were not created for every order.  February 6 Tr. at 26:7-14.  Rather, he created a bill of lading for shipments delivered to a warehouse by Sound Around's truck.  February 6 Tr. at 26:7-10.  He did not create a bill of lading for shipments delivered directly to a distributor or store directly, so that for these shipments, the documentation would include the picking ticket only.  February 6 Tr. at 26:12-14.

Mr. Newman did not specifically recall the sale or shipment of the Merchandise to Sound Around in 1999.  February 6 Tr. at 15:3-5.  He recalled that the model numbers of the items listed on the Sound Around Invoice "used to be Cougar model numbers."  February 6 Tr. at 16:1-5.  Those items were "close-out" types of items rather than items shipped regularly by Sound Around.  February 6 Tr. at 17:25-18:4.

Mr. Newman explained that once a shipment of goods was sent out of the Sound Around warehouse and delivered, he retained a copy of the bill of lading signed by the driver and a copy of the picking ticket.  February 6, 2008, Trial Tr. 19:21-20:9.  It was his practice to keep these documents on his "table" so that if a Sound Around customer contacted the company with a complaint about a shipment, he would be able to "figure it out right away."  February 6 Tr. at 20:10-18.  Mr. Newman kept copies of the bills of lading and picking tickets on his table until "it gets too stacked . . . approximately between 10 and 12 months," and if he received no complaints, he discarded the documents from the bottom of the stack.  February 6 Tr. at 20:19-25.

Mr. Newman noted that a customer would typically raise any complaint within a day or two of delivery.  February 6 Tr. at 21:4-10.  He had no recollection of receiving any complaints with respect to the Merchandise listed on the Sound Around Invoice.  February 6 Tr. at 19:18-20.

-23-

Mr. Newman testified that he does not currently have any documents from shipments made by Sound Around in 1999.  February 6 Tr. at 21:16-22.

*The Trustee's Response to Sound Around's Evidence*

The Trustee argues that Sound Around has failed to rebut the Trustee's case because "Sound Around has failed to present any credible evidence demonstrating the delivery of fair consideration to the Debtors in exchange for the [Sound Around] Transfer."  Trustee's Proposed Findings of Fact and Conclusions of Law at 13.  The Trustee notes that "[n]either of Sound Around's witnesses had any personal knowledge of the [Sound Around] Transfer or the alleged transaction" and that "Sound [Around] failed to introduce a single reliable business record memorializing the delivery of fair consideration to the Debtors in exchange for the [Sound Around] Transfer."  *Id.*

*            *            *

The Court finds that Mr. Brach and Mr. Newman were credible and persuasive fact witnesses.  Sound Around's evidence shows that pursuant to the Arbitration Award, Sound Around, through its sales force, sought out purchasers for a "close-out" sale of the Cougar merchandise.  The evidence also shows that the Sound Around Invoice lists items that were part of the Cougar merchandise that Mr. Brach was directed to liquidate under the Arbitration Award, and that the total purchase price indicated on the Sound Around Invoice corresponded to the liquidation value, or less than the fair market value, of the goods.  And the evidence shows that the sale of the Merchandise is reflected in a contemporaneous business record, Sound Around's 1999 Invoice Sales Journal, which sets forth the terms of the transaction, including the invoice number and sale amount, and identifies "Rona Dist[ributors]" as the customer.

The evidence further shows that it was Sound Around's ordinary business practice to retain documents relating to the sale and shipment of goods for a period of time and then to discard them.  Shipping documents were discarded after approximately fifteen months, and paper invoices were discarded after three to four years.  This action was commenced in 2005, almost six years after the Sound Around Transfer and, based upon Sound Around's ordinary business practices, documents relating to the sale and shipment of the Merchandise would have been discarded.  The evidence does not show that Sound Around's sale and delivery of the Merchandise was treated in a different manner than other sales and shipments in the same time period, or that the absence of a picking ticket, order sheet, or bill of lading so many years after the transaction supports an inference that the Merchandise was not shipped.

Finally, the evidence shows that neither Sound Around nor its owner Mr. Brach had any personal or business ties with any member of the Jacobs family, any knowledge of how the transaction was recorded, or any reason to engage in a transaction with Allou or any of its affiliates on other than ordinary business terms.  And the evidence shows that neither Mr. Brach nor Mr. Newman recalled that anything unusual was associated with the transaction, including the sale of the Merchandise, the Sound Around Invoice, or the Sound Around Transfer.

In sum, and based on the entire record, the Court finds and concludes that Sound Around has met its burden of coming forward with evidence to rebut the Trustee's *prima facie* case.  The ultimate burden of proof remains with the Trustee, and the Trustee has not established, by a preponderance of the evidence, that Sound Around did not provide fair consideration for the

Sound Around Transfer.[10]

## Conclusion

For the reasons stated herein, the Court finds and concludes that the Trustee has not established that the Sound Around Transfer was not made for fair consideration. Accordingly, judgment is awarded in favor of Sound Around, and the Amended Complaint is dismissed with prejudice. An order and judgment in accordance with this Memorandum Decision will be entered simultaneously herewith.

Dated: Brooklyn, New York
        April *23*, 2009

                            *s/Elizabeth S. Stong*
                            ELIZABETH S. STONG
                            UNITED STATES BANKRUPTCY JUDGE

---

[10] The Trustee has also not established the elements of his unjust enrichment claim. Under New York law, a trustee seeking recovery based on unjust enrichment has the burden of proof. *See MacDraw, Inc. v. CIT Group Equipment Financing, Inc.*, 157 F.3d 956, 963 (2d Cir. 1998). The elements of an unjust enrichment claim are "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that 'equity and good conscience' require restitution." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000). The "essence" of an unjust enrichment claim "is that one party has received money or a benefit at the expense of another." *Id.* (quoting *City of Syracuse v. R.A.C. Holding, Inc.*, 258 A.D.2d 905, 905, 685 N.Y.S.2d 381, 381 (4th Dep't 1999). Here, the Trustee did not establish that Sound Around did not provide fair consideration for the Sound Around Transfer and, accordingly, has failed to establish that Sound Around enriched itself at the expense of the Debtors. *See* pp. 10-16, *supra.*